**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MONITA HARA,

      Plaintiff,

          v.

THE PENNSYLVANIA DEPARTMENT OF
EDUCATION, JOHN TOMMASINI, AND
CHRISTINE BRENNAN,

      Defendants.

CIVIL ACTION NO. 3:09-CV-1014

(JUDGE CAPUTO)

<u>**MEMORANDUM**</u>

      Presently before the Court is Defendants John Tommasini and Christine Brennan's Motion for Summary Judgment. (Doc. 43). Plaintiff Monita Hara brought this action against the Defendants seeking damages for a First Amendment retaliation claim. In their Motion, Defendants counter that Plaintiff's speech was not protected, that qualified immunity is warranted, and that the damages Plaintiff is seeking are excessive. The Court agrees, and for the reasons below will grant Defendants' Motion.

**I. Background**

      Plaintiff, Monita Hara, was employed by the Pennsylvania Department of Education ("PDE") as the Superintendent of the Scranton State School for the Deaf ("SSSD"). (Am. Compl. ¶ 10, Doc. 9). Defendant John Tommasini was, at all relevant times, employed as the Director of the Bureau of Special Education while Defendant Christine Brennan was employed by the PDE as Director of Human Resources.

On April 20, 2009, Plaintiff, acting as a private citizen, submitted an op-ed to the *Scranton Times* newspaper expressing her concern with the proposed closing of the SSSD. (*Id.* at ¶¶ 11, 23).  On or about May 11, 2009, Defendant Tommasini contacted Plaintiff and informed her that she was to meet with him in Harrisburg, Pennsylvania the following day. (*Id.* at ¶ 15).   At this meeting, for which Defendant Brennan was present, the parties discussed the *Scranton Times* article.  Tommasini and Brennan then left the room.  When they returned, they questioned Plaintiff about her denying access to a group of individuals attempting to conduct inventory at the SSSD.  (*Id.* at ¶ 24).  Plaintiff explained that those individuals had been denied for lacking the proper clearances, to which Brennan responded that Plaintiff was being transferred to Harrisburg.  (*Id.* at ¶¶ 26-27).  Plaintiff was then informed that they had not yet decided on her new position in Harrisburg, and Plaintiff communicated to Brennan and Tommasini she did not understand why the PDE kept changing its explanation of why SSSD would be closed. (*Id.* at ¶¶ 27-28).  Tommasini and Brennan again left the room and returned.  Upon their return, Brennan informed Plaintiff that she was being suspended for ten (10) days without pay or benefits.  (*Id.* at ¶ 30).  Plaintiff was then forced to resign to avoid tarnishing her impeccable employment history and reputation with a baseless suspension.  (*Id.* at ¶ 31).

Plaintiff brought a claim pursuant to 42 U.S.C. § 1983 against the Pennsylvania Department of Education, John Tommasini, and Christine Brennan, alleging that she was constructively discharged in retaliation for exercising her First Amendment free speech rights.  She also brought a state law claim for Constructive Discharge.  In my January 22, 2010 Order, I granted the Defendants' Motion to Dismiss the state law claim and the claim

against the Pennsylvania Department of Education.  (Doc. 20).  The First Amendment retaliation claim was allowed to proceed against the individual Defendants in their individual capacities.

Defendants now move for Summary Judgment, alleging (a) that Plaintiff's First Amendment retaliation claim fails as a matter of law; (b) that the Defendants are entitled to qualified immunity; and (c) that the Plaintiff is not entitled to all the damages she seeks for lost wages.  (Doc. 43).  The issue is ripe and has been fully briefed before the Court.

## II. Discussion

### A. Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c)(2).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *Anderson*, 477 U.S. at 248.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.  Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment

3

as a matter of law.  *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law.  *Anderson*, 477 U.S. at 256–57.  The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial."  *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)).  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."  *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth

4

of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## B.  Claim of First Amendment Retaliation

The Supreme Court has "made clear that public employees do not surrender all their First Amendment rights by reason of their employment.  Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  However, restrictions on employee speech "are justified by the consensual nature of the employment relationship and by the unique nature of the government's interest."  *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011).

This tension requires that "[w]hen a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern."  *Id.* at 2493 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983)).  Therefore, as an initial matter, the Court must determine: (a) whether Hara was speaking as a citizen; and (b) whether she was speaking on a matter of public concern.  If both are answered in the affirmative, the Court must then determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Specifically, such "adequate justification" requires the Court to "balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"  *Duryea*, 131 S. Ct. at 2493 (citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will*

5

*Cty.*, 391 U.S. 563, 568 (1968)).

In a First Amendment retaliation action, a Plaintiff must, in addition to demonstrating the existence of protected speech outlined above, ultimately show that such "protected activity was a substantial factor in the alleged retaliatory action." *Kougher v. Burd*, 274 Fed. Appx. 197, 201 (3d Cir. 2008).  While the Defendants reserve opinion as to whether the Plaintiff's newspaper action constituted such a substantial factor, they move for summary judgment  solely on the theory that Plaintiff's action was not protected speech.  (Doc. 5 at 4-5).  Whether speech is protected or not is a question of law.  *Connick,* 461 U.S. at n.7; *Kougher*, 274 Fed. Appx. at 201.

### (1.) Matter of Public Concern

As the Defendants do not contest that the Plaintiff's newspaper article was addressing a matter of public concern, the Court finds that this element is satisfied.

### (2.) Speaking as a Citizen

Though unclear, it also appears that Defendants do not contest the Plaintiff's assertion that she was speaking as a citizen.  In their Reply Brief, the Defendants write that they "explained in their initial brief that this issue is neither in dispute nor is it controlling as to the outcome of the motion for summary judgment." (Doc. 51 at 7).  The Court agrees with the Defendants that this is "merely the starting point of the analysis" and is satisfied with the Plaintiff's assertion that she wrote the article on her own time from her own home.  (Doc. 48 at 4).  As such, the Court will turn to the crucial question of this Motion, whether the government employer's interest outweighed Plaintiff's First Amendment rights.

**(3.) Balanced Against the Government's Interest**

"Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). However, any such restrictions must be tailored to preclude only speech that has the potential to disrupt the agency's functions. *Id.* Thus, the question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). However, such a determination "must be balanced against the employee's interest in addressing matters of public concern and enabling the electorate to make informed decisions." *Curinga v. City of Clairton*, 357 F.3d 305, 309-10 (3d Cir. 2004). In addressing this delicate balance, a court must consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* at 310 (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

The Defendants contend that "[b]ecause [Plaintiff] was in a position of leadership in PDE, defendants were entitled to impose discipline for plaintiff's deliberate, counter-productive, and potentially deal-breaking opposition to the transfer of SSSD to private ownership and operation." (Doc. 45 at 4). Such opposition consists of Hara's letter to the editor, published in the *Scranton Times*, which elaborated upon the virtues of SSSD, arguing that "[i]t is important for SSSD to exist" and that "[e]xtinction is not an option [for SSSD]." (Doc. 48-1, Ex. A). Hara's letter further made light of the Governor's proposed

7

budget cut for the SSSD, and that "SSSD, and all of [its] many supporters, do not agree with this proposal." (*Id.*).  She closes with an appeal to the public, stating: "continue to write letters, contact your legislators, and ask the good Governor Rendell for a change of heart, so that SSSD will remain one 'great good place' and a public place as it has been for nearly 130 years." (*Id.*).

The Court cannot readily conclude that this letter is sufficient to impair discipline by superiors or interfere with harmony among co-workers.  *Curinga*, 357 F.3d at 309-310. Instead, the Court will analyze the article in light of its "detrimental impact on close working relationships for which personal loyalty and confidence are necessary," and its potential to "interfere[] with the regular operation of the enterprise." *Id*.  In urging the Court that Hara's letter had the potential to jeopardize support for their plan in the General Assembly, Defendants allege that the negative effects of Plaintiff's speech were exacerbated as it was made "during a critical transition period" by a "high-ranking or influential public employee." (Doc. 45 at 1).  Defendants claim that "[t]he speech activity of the plaintiff in this case created both actual harm and the reasonably foreseeable risk of failure in the negotiations and transfer of ownership of SSSD to the Western Pennsylvania School for the Deaf." (*Id.* at 7).

While there is some disagreement as to the exact timing of events, it is clear that a decision was made prior to Plaintiff's letter to the editor to discontinue public operation of the SSSD, although this decision could not technically be finalized until the General Assembly actually voted on it.  (Tommasini Dep. 89:14-21; 36:3-10, April 19, 2011, Doc. 48-11). Plaintiff leverages the need for political approval to argue that it would be impossible for her to have known at the time of her writing the letter that the school would definitely be closed, and that it would therefore be impossible for her to foil a plan she did not even know about,

claiming that "no one told her [SSSD] was definitely closing until after she submitted the Letter to the Editor." (Doc. 48 at 10-11). However, in her deposition, Plaintiff states that she was informed at the end of April, 2009 that the SSSD would be closed as of June 30, 2009. (Hara Dep. 63:24-64:19; 82:17-23, April 8, 2011, Doc. 48-9). Moreover, she knew that the school would be closing around that date as of February 4, 2009. (*Id.* at 82:2-20). The record is very clear that Hara did know, at the time her letter was published, that her superiors were making a full attempt to close the SSSD.

Plaintiff next claims that as she lacked concrete information or the power to make or change policies, there was no real potential for her to disrupt the SSSD proceedings. (Doc. 48 at 14). As such, Plaintiff argues that the letter could not have been disruptive as it only provided information that allowed the community to fight for the school, and points to a dearth of evidence that her actions actually instigated any turmoil. (Doc. 48 at 8). The Court agrees that there is no such evidence, although, whether Plaintiff actually affected a change is not relevant, as a government employer may impose conditions "directed at speech that has some *potential* to affect the entity's operations." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (emphasis added). Moreover, that the transformation was still in progress weighs against the Plaintiff, for it is her potential to undermine her employer's ongoing and unrealized efforts that legitimize her employer's interest in curtailing that speech.

The very intention of Hara's letter was to intrude on the plans of her supervisors, and as the Court finds that Plaintiff's speech had real potential to disrupt her employer's plans regarding the SSSD, it is not protected as a matter of law. Hara, as Superintendent of SSSD, was the highest ranking employee at that school and was told by her superior that her support would be necessary to facilitate the transition. (Zahorchak Decl. at ¶ 11, Doc.

9

44-1).  Additionally, as the PDE's plan required political affirmation, a popular appeal had the real potential to undermine the PDE's plans, especially when authored by the SSSD's Superintendent.

While clear that Plaintiff's speech had the potential to disrupt the plans of her organization, it is less clear whether Hara's conduct was additionally detrimental to vital working relationships.[1]  To be as such, there must be a sufficiently close nexus between the two parties to form a plausible basis for reliance.  "The crucial variant in this balance appears to [be] the hierarchical proximity of the criticizing employee to the person or body criticized."  *Sprague v. Fitzpatrick*, 546 F.2d 560, 564 (3d Cir. 1976).  Sufficient standing within the organizational structure is a gauge used by courts to analyze the detrimental potential of a particular employee's speech.

The genesis of this notion is *Pickering*, *supra*, where the Supreme Court opined that a teacher's public criticisms were not outweighed by its employer's interests as the teacher's comments did not have the potential to impede on his performance as a teacher or interfere with the school's overall operations.  391 U.S. 572-73.  Similarly, in *Watters v. City of Philadelphia*, a "close working relationship" was determined to be lacking between the Police Commissioner and the manager of an employee assistance program for the department as the manager was determined to be too far removed from the Commissioner within the chain

---

[1]As an initial matter, the Court notes that the working relationship between Hara and her superiors had already become strained over Plaintiff's persistent resistance to the changes that were happening at the SSSD.  (Brennan Dep. 67:16-71:2, Mar. 28, 2011, Doc. 48-13).  The Pennsylvania Secretary of Education, Gerald L. Zahorchak, attested that Hara's opposition to the changes at the SSSD made it rather difficult to address the issues with her.  (Zahorchak Decl. at ¶ 16, Doc. 44-1).  In fact, the decision had been made to terminate Plaintiff's employment prior to her letter and a termination letter had been written, but the Governor's Office ultimately intervened, not wanting to increase the attention surrounding the closure of the school.  (Brennan Dep. at 70:23-72:25).

of command, evinced by insufficient responsibility and an inability to shape policy.  55 F.3d

886, 898 (3d Cir. 1995).  Such "[p]roximity within an organizational hierarchy is a significant

factor in the employer's demonstration that a public employee's speech had a detrimental

impact on a necessarily close working  relationship." *Swineford v. Snyder County*, 15 F.3d

1258, 1272-73 (3d Cir. 1994).

Conversely, *Sprague v. Fitzpatrick* presented an instance of an extremely close

nexus, where the First Assistant District Attorney was the effective "alter ego" of the District

Attorney though acting as a conduit for information and assisting to formulate policy.  546

F.2d 560, 562 (3d Cir. 1976).  The Third Circuit held that the closeness of the working

relationship between the parties had effected an "egregious example of disruptive impact."

*Id.* at 565.  Notably, that court also commented that "[i]f the arousal of public controversy

exacerbates the disruption of public service, then it weighs against, not for, first amendment

protection in the Pickering balance."

The above cases offer factors to consider when making the difficult determination that

an individual's free speech rights may be outweighed by her employer's interest.  Using them

as guides, the Court determines that Hara's sensitive leadership position within the hierarchy

balances firmly against her.  Hara was not the literal alter-ego of the Superintendent, nor

does it appear that she had the direct ability to shape policy beyond the SSSD, but she was

certainly the information conduit. The Court agrees that Plaintiff's position as Superintendent

of the SSSD placed her in square proximity with the upper echelons of the Department of

Education, both in practice and in the eyes of the public, affording her a serious potential to

arouse public controversy.  Moreover, as the top official at the SSSD, Hara was instrumental

in the transition of the school, and the argument that she was "not in the top 10% of the

11

organization hierarchy," (Doc. 48 at 3), while unsubstantiated, is also ultimately unavailing. Hara's eminent position at SSSD caused her to be relied upon by the Pennsylvania Secretary of Education to further their policies in specific regard to the SSSD, and her actions cut directly against this goal, having "the potential to deprive the faculty, staff, and students of leadership and information during a time of uncertainty." (Zahorchak Decl. at ¶ 18, Doc. 44-1).  Ultimately, it is Plaintiff's position at the SSSD and her employer's reliance on her that are most persuasive in tipping the balance in Defendants' favor.

Plaintiff's case is similar to *Smith v. School District of Philadelphia*.  158 F.Supp.2d 599 (E.D. Pa., 2001).  There, the plaintiff was removed from his position on part of the "School Support Team" when an inflammatory letter he had previously written to the school's principal came to the public's attention.  *Id.* at 601-03.   In a resulting action for First Amendment retaliation, that court noted the wake of actual disruption that his letter caused, not relevant to the instant case, but it also reflected on the unique position the plaintiff held within the school district's operating structure:

> [P]laintiff was a member of a team specifically created for the evaluation of Carver as a result of Carver's failure to meet its performance goals.  The Carver Support Team was responsible for meeting with staff and parents from Carver, interviewing teachers and students, and distributing a survey to staff and parents.  The maintenance of healthy working relationships with the other team members, teachers, administrators, and parents at Carver was thus essential to plaintiff's performance of his responsibilities on the Carver Support Team.

*Id.* at 608.  While not even a full employee, a volunteer with a "quasi-employment relationship," that plaintiff's regular proximity to sensitive parties was highly relevant in evaluating the instability his words could sew.  Analogous to *Smith*, during SSSD's transformation, Hara's particular working relationships with her students, their parents, and

12

the community similarly placed her in a delicate position for which her actions would be subjected to intensified public scrutiny and would have heightened consequences.  As such, the Court finds Superintendent Hara's hierarchical proximity to the body criticized, the Pennsylvania Department of Education, sufficiently close as to warrant a very strong interest on the part of the public employer.

In weighing the Plaintiff's interest in free speech, Defendants argue that Plaintiff's interest should be given less weight  as Plaintiff's proffered objective of supporting deaf education at the SSSD "was precisely the goal of the PDE, which decided . . . that the school would operate more successfully under the direction of a private organization." (Doc. 45 at 11).  Such an argument was found persuasive when a doctor spoke out against the closure of a government laboratory, but where the clinical activities were not ultimately terminated, but transferred to another facility.  *Yu v. U.S. Dept. Veterans Affairs*, No. 08-933, 2011 WL 2634095 at *17 (W.D. Pa. July 5, 2011).  In light of the reduced net utility of the doctor's speech, that court found he held a diminished interest in the free speech itself.  *Id.*  Such logic must be used carefully as it could potentially discount the value of free speech in instances where such speech ultimately achieved its intended effect, but the Court notes it is relevant in the instant situation where the school was ultimately not abandoned, but transformed.  The record indicates that the SSSD operated in substantially the same form for the year following the transition to private management, at which point the "vast majority" of students were transferred around Scranton, though some had educational requirements that necessitated their transfer to Pittsburgh.  (Tommasini Tr., 43:13-46:7).  While the Plaintiff could not be expected to have predicted the future, in her Answer to Defendants' Statement of Facts she contests Defendants' assertion that they could have simply

13

abandoned the school, stating that "PDE had federal and state obligations to continue the school since they had accepted federal monies and could not just abandon the deaf children." (Doc. 49 at ¶ 45).   As such, the Court determines the value of Plaintiff's free speech is significantly outweighed by the detrimental potential it had on close working relationships and on the PDE's operations at the SSSD.

### III. Conclusion

Since, as a matter of law, the public employer's interest outweighs Plaintiff's interest in free speech, the Court finds that Plaintiff's speech is ultimately unprotected.   Therefore, the Court will grant the Defendants' Motion for Summary Judgment on Plaintiff's First Amendment retaliation claim.   In so granting the Defendants' Motion, the Court deems moot Defendants further arguments pertaining to qualified immunity and excess damages.

An appropriate order follows.


 October 31, 2011                                    /s/ A. Richard Caputo
Date                                                      A. Richard Caputo
                                                            United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MONITA HARA,

       Plaintiff,

          v.

THE PENNSYLVANIA DEPARTMENT OF
EDUCATION, JOHN TOMMASINI, AND
CHRISTINE BRENNAN,

       Defendants.

CIVIL ACTION NO. 3:09-CV-1014

(JUDGE CAPUTO)

**ORDER**

     **NOW**, this 31st day of October, 2011, **IT IS HEREBY ORDERED** that the Defendant's

Motion for Summary Judgment (Doc. 43) is **GRANTED**.

                         /s/ A. Richard Caputo
                         A. Richard Caputo
                         United States District Judge